DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KATHERINE L. WAWRZYNIAK (CABN 252751)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7317
    FAX: (415) 436-7234
    katherine.wawrzyniak@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. CR 18-290 WHA** |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| MIGUEL ANGEL VALENCIA-GARCIA, | |
| Defendant. | |

## I.    INTRODUCTION

Miguel Angel Valencia-Garcia is the first defendant to be sentenced in this seven-person drug trafficking case. His role in the subject drug trafficking organization was as a broker who connected Southern California-based sources with Northern California-based distributors. Valencia-Garcia was two levels up from Eric Jimenez, the street-dealer with which the investigation began. From federal wiretaps, we know that in January 2018, Valencia-Garcia arranged a 10-kilogram methamphetamine re-supply, as well as the sale of approximately 350 grams of black tar heroin. On April 17, 2018, officers intercepted him as he drove a kilogram of what he believed to be China white heroin from Orange County to Santa Clara, California. He was arrested and booked on an outstanding state warrant and has remained in jail in Santa Clara County since.

UNITED STATES' SENTENCING MEMO.    1
CR 18-290 WHA

To defendant's credit, he took responsibility for his conduct relatively quickly.  He pled guilty on March 5, 2019, and now comes before the Court to be sentenced.  This is defendant's fourth felony drug conviction.  Given his criminal history and the seriousness of the conduct, the government believes that the appropriate sentence is the jointly recommended 135 months in custody as well as $300 in special assessments.  The government agrees with Probation that the fine should be waived, and that defendant should serve 5 years of supervised release should defendant remain in or return to the United States.

## II.    FACTS

Defendant surfaced in the instant investigation in January 2018.  DEA agents were intercepting calls over the cellphone of Ramon Farias-Gonzalez and soon identified defendant as Farias-Gonzalez's business partner.  Defendant subsequently became a wiretap target himself.  Between January and April 2018, the defendant and Farias-Gonzalez spoke by phone frequently about pending drug transactions, payments, and mutual customers and connections.  They would also meet in person from time to time, sharing a meal at a restaurant or posting up at Mazzocco's Club in Redwood City, which defendant referred to as "the office."  As outlined in the PSR, wiretap evidence and surveillance proved defendant's involvement in three significant drug transactions:

- Methamphetamine Re-Supply.  In mid-January 2018, defendant arranged for a courier to deliver methamphetamine to Farias-Gonzalez and his associates in Los Angeles.  10 kilograms or "two hands" were for Farias-Gonzalez to distribute.  The courier was delayed, but ultimately delivered the product to Farias-Gonzalez on the morning of January 22.  After Farias-Gonzalez returned home, he advised defendant that they had been shorted, saying they got 22 pounds instead of 10 kilograms.  Defendant assured Farias-Gonzalez all would be well: "I'm telling you not to worry, it's fine, don't worry.  I'm just going to call them so they know."  That snippet illustrates how defendant controlled the connection to the more powerful Southern California suppliers.

- Black Tar Heroin Sale.  On January 26, 2018, defendant set up a heroin exchange for the next day.  He told Farias-Gonzalez that the customer would be contacting him.  The next day, January 27, Farias-Gonzalez and the customer spoke directly and agreed to meet in the Home Depot parking lot in East Palo Alto.  Farias-Gonzalez spoke to defendant before he left for the meeting, to confirm that it was ok for him to give the customer "the burrito" (code for heroin).  Agents

conducted surveillance and observed Farias-Gonzalez meeting with the customer. Officers later traffic stopped the customer and seized a burrito-shaped bindle of black tar heroin, weighing about 350 grams.

- <u>Attempted China White Heroin Sale</u>. In April 2018, defendant went to visit family in Southern California. While he was there, he spoke to a source of supply in Tijuana, Mexico who offered him a kilogram of China white heroin. On April 16, defendant reached out to a customer in Redwood City who said he was interested in selling it. The product arrived that evening, wrapped in three separate packages. Defendant took possession of it around 10 p.m., and he and his sometime girlfriend began driving north toward Santa Clara. DEA coordinated with local law enforcement in Gilroy, California, to intercept defendant en route. A search of the vehicle he was traveling in revealed three packages of suspected heroin in a bag in the trunk. (Laboratory testing later revealed that defendant had been duped; the China white was nothing more than noscapaine, a cutting agent.)

The charges against defendant in the First Superseding Indictment track to each of the three transactions outlined above: conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine (Count One); conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin (Count Two); and attempted possession with intent to distribute heroin (Count Seven). Defendant pled guilty to all three counts on March 5, 2019, pursuant to a C-plea, which provides that a reasonable and appropriate disposition of the case is 135 months' imprisonment, no fine, 5 years of supervised release, $300 in mandatory special assessments, and forfeiture of certain items.

**III.   DISCUSSION**

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant. 18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing

disparities and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991. The Guidelines should be the starting point and the initial benchmark. *Gall v. United States*, 552 U.S. 38, 49 (2007). Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

### A.    Valencia-Garcia's Guidelines Range is 135-168 Months.

The parties and Probation are in agreement that the Guidelines range is calculated as follows:

| | |
|---|---|
| Base Offense Level, § 2D1.1(a)(5), (c)(3),<br><br>      At least 10,000 but less than 30,000 kg converted drug weight | 34 |
| Specific Offense Characteristics | N/A |
| Acceptance of Responsibility, § 3E1.1 | -3 |
| Total Offense Level | 31 |
| Criminal History Category (6 points) | III |
| Range | 135-168 months |

#### 1.    The Base Offense Level is 34.

The base offense level in a drug case is determined by the aggregate weight of the drugs for which the defendant is responsible. U.S.S.G. § 2D1.1 applic. notes 5, 7. The parties' plea agreement details the drug conversions showing that defendant is responsible for 21,350 kg converted drug weight. Probation agrees that quantity of drugs represents the relevant conduct. That quantity corresponds to a base offense level 34.

#### 2.    Valencia-Garcia is Entitled to a Three-Level Deduction for Acceptance.

Defendant notified the government of his intent to plead guilty shortly after his first appearance in District Court, thereby permitting the government to avoid preparing for trial. Accordingly, he is entitled to a three-level deduction for responsibility under U.S.S.G. § 3E1.1.

//
//

### B. The Government Recommends 135 Months.

Here, the parties agreed to a total sentence of 135 months. The Court must decide whether to accept or reject the parties' agreement. Fed. R. Crim. Proc. 11(c)(3)(A). The Court has broad discretion to accept or reject the plea agreement. *United States v. Harris*, 679 F.3d 1179, 1182 (9th Cir. 2012). The Court should consider whether the negotiated sentence "is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case." *Id*. *See also United States v. Miller*, 722 F.2d 562, 565 (9th Cir. 1983) (categorical rules regarding acceptance or rejection of plea agreements are improper). For the reasons discussed below, the government believes that the negotiated sentence is appropriate and asks that the Court accept the agreement.

As is readily apparent from his criminal history, defendant is an inveterate drug dealer. He was first arrested on drug trafficking charges in 1984 and has three prior felony drug convictions. This is not the first time defendant has been targeted by the DEA either; his most recent state conviction arises out of a 2013 DEA investigation. Given his repeated contact with law enforcement and his lack of verifiable employment, it seems likely that he has lived off his drug trafficking for many years, if not his entire adult life. Moreover, prior prison sentences, including one of 18 years, have failed to deter him from returning to the trade he knows. He has also repeatedly returned to the United States after being deported, further evincing a disrespect for the law.

As for how this defendant compares to the codefendants and other federal drug defendants, the government sees him as a person who primarily directs others to transport kilogram quantities of drugs. That pattern is evident in the 2007 Torrance PD case, the 2013 DEA case, and the instant case. Defendant is sophisticated enough to avoid personally handling drugs whenever possible. (His transport of the China white in April 2018 was somewhat aberrational.) He seems to see himself as a businessman, a dealmaker. On the one hand, that makes him less obviously dangerous than street dealers like Eric Jimenez and Armando Calderon. Unlike them, he didn't hold himself out as a tough guy or keep guns in his possession. He has no convictions for violent crimes. But on the other hand, defendant's higher level trafficking activity was insidiously dangerous; he simply willfully ignored the downstream effects of his conduct. The product he sold ultimately ended up in the hands of addicts, whose drug use wreaks havoc on themselves, their families, and the community. One need only walk

the streets of the Tenderloin to see the erratic and sometimes dangerous behavior caused by smoking or injecting methamphetamine.  It is a powerful upper that emboldens users, many of whom commit property crimes and vandalism in search of their next high.  As for the heroin, the country is in the grips of an opioid epidemic.  The China white that defendant attempted to traffic is supposed to be even more potent than black tar heroin and has been linked to numerous overdose deaths.  *See* Annamarya Scaccia, *"China White": What you Need to Know About Heroin-Like Drug*, ROLLING STONE, available at https://www.rollingstone.com/culture/culture-news/china-white-what-you-need-to-know-about-heroin-like-drug-107437/ (last visited August 13, 2019).

In sum, the recommended 135-month sentence, while lengthy, is justified by the seriousness of the conduct, defendant's criminal history, and defendant's culpability relative to other drug traffickers.  It serves the dual goals of punishment and deterrence and will ensure that this defendant is incapacitated until he is about seventy years old.  At some point, one hopes, he will truly age out of drug trafficking.

**C.    The Government Recommends that the Federal Sentence Be Consecutive to the State Sentence Defendant is Currently Serving.**

In March of this year, defendant resolved the Santa Clara County case stemming from the 2013 DEA investigation.  He received a sentence of 3 years, to be served at 50% in the local jail.  Defendant has almost completed that sentence and is set to be released in October of 2019.  This Court has discretion to order that the federal sentence run consecutively to the state sentence.  *See Setser v. United States*, 566 U.S. 231, 244 (2012).  The government believes that consecutive time is appropriate because the Santa Clara conviction arises out of an entirely different set of facts.  In addition, the only reason that concurrent time is even a possibility is because defendant was a fugitive from the time charges were filed in Santa Clara in 2014 to his arrest in 2018.  It seems perverse to effectively reward defendant for delaying resolution of the state matter.

//
//

## IV. CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence defendant Miguel Angel Valencia-Garcia to 135 months in custody and $300 in special assessments. As the PSR notes, he is likely to be deported; however, should he return to the United States, he should be subject to a three-year term of supervised release with the special conditions outlined in the PSR.

DATED:  August 13, 2019                          Respectfully submitted,

DAVID L. ANDERSON
United States Attorney


_____/s/_____
KATHERINE L. WAWRZYNIAK
Assistant United States Attorney